# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 03-632V
### Filed: August 31, 2017
UNPUBLISHED

R.K. on behalf of A.K., a Minor,

                    Petitioner,

v.

SECRETARY OF HEALTH AND
HUMAN SERVICES,

                    Respondent.

Attorneys' Fees and Costs

*John F. McHugh, New York, NY, for petitioner.*
*Heather L. Pearlman, U.S. Department of Justice, Washington, DC, for respondent.*

## DECISION ON ATTORNEYS' FEES AND COSTS[1]

**Hastings,** Special Master:

      On March 24, 2003, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.,*[2] (the "Vaccine Act"). In an amended petition filed February 28, 2011, petitioner alleged that A.K. suffered severe developmental issues caused by two pediatric doses of influenza vaccine administered November 2, 2001, and December 6, 2001. (ECF No. 126.)

      After prolonged litigation, former Chief Special Master Vowell issued a decision denying entitlement on September 28, 2015. (ECF No. 320.) A motion for review was denied on December 18, 2015 (ECF No. 341) and judgment entered on February 12, 2016 (ECF No. 350). An appeal to the Court of Appeals for the Federal Circuit was unsuccessful. (ECF No. 361.)

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Petitioner now moves for an award of final fees and costs in the total amount of $683,926.13. (ECF No. 362.)  For the reasons described below, I award petitioner attorneys' fees and costs in the reduced amount of $225,702.10.

# I
## PRIOR PROCEDURAL HISTORY AND THE INSTANT MOTION

The procedural history of this case has been discussed extensively in prior decisions addressing the merits of petitioner's claim and need not be repeated.[3]  Although this case saw extensive litigation over an extended period of time, much of that history has been accounted for by two previous awards of interim fees and costs.

On January 10, 2013, several months prior to the April 2013 hearing in this case, petitioner moved for an award of interim costs to cover both previously incurred expert costs as well as estimated costs for the appearance of petitioner's expert witnesses at the upcoming hearing. (ECF No. 190.)  Petitioner initially requested $81,750.00 (ECF No. 190), but in a status report subsequently indicated that payment of past expenses would be sufficient to proceed (ECF No. 211.)  Interim costs were awarded in the amount of $24,108.12. (ECF No. 215.)

Later, on May 11, 2015, the parties submitted a Stipulation of Fact Concerning Interim Attorneys' Fees and Costs.  (ECF No. 311.)  In this stipulation, the parties requested a decision awarding interim attorneys' fees and costs in the amount of $435,000.00. (*Id*.) This amount "consists of all attorney and paralegal fees and costs incurred by petitioners and their counsel through April 30, 2013."[4] (*Id*., ¶4.) A decision awarding this amount issued on May 15, 2015. (ECF No. 312.)  Thus, attorneys' fees and costs were settled for all work and expenses incurred through the completion of the hearing in this case.

On May 15, 2017, petitioner filed a motion for final attorneys' fees and costs.  (ECF No. 362.)  Petitioner's motion includes billing records by three attorneys – counsel of record, John F. McHugh (ECF No. 362-3) as well as appellate counsel Gilbert Gaynor (ECF No. 362-4) and trial co-counsel Helen C. Sturm (ECF No. 363-1). The billing records include billing from May 2, 2013, to May 10, 2017, which spans (1) the immediate post-hearing period (May 2, 2013 to August 21, 2015), mostly including work performed in preparation of post-hearing briefs; (2) prosecution of the unsuccessful motion for review (September 28, 2015 to February 10, 2016); (3) appeal to the Court of Appeals for the Federal Circuit (March 18, 2016 to December 14, 2016); and finally (4) time spent preparing the instant motion (January 18, 2017 to May 10, 2017).[5]

---

[3] Certain aspects of the procedural history will be addressed throughout this decision as relevant to my findings.

[4] The last day of the hearing in this case was April 29, 2013. (*See* Minute Entry, 4/29/2013.)

[5] This decision mostly focuses on the first three of these phases and addresses them in reverse chronological order.

In the motion, petitioner cites requested amounts of $353,518.00[6] in attorneys' fees (for McHugh and Gaynor) and $15,269.13 in costs; however, the motion further requests an award for Ms. Sturm's services "in an amount as [the court] may consider just and proper." (ECF No. 362, p. 20.)  Ms. Sturm separately billed $306,375.00.[7]  (ECF No. 363-1.)  Therefore, the total amount requested by petitioner is actually $683,926.13.[8]  Thus, combined with the prior interim awards of attorneys' fees and costs, petitioner proposes to be awarded a *shocking* $1,142,534.25 total for attorneys' fees and costs for the prosecution of this case.[9]

On May 19, 2017, respondent filed a response to petitioner's motion.  (ECF No. 364.) Respondent argues that "[n]either the Vaccine Act nor Vaccine Rule 13 contemplates any role for respondent in the resolution of a request by a petitioner for an award of attorneys' fees and costs." *Id.* at 1.  Although respondent indicated that he is "satisfied the statutory requirements for an awards of attorneys' fees and costs are met in this case," he also stressed that special masters "are not required to rely on specific objections raised by respondent." *Id.* at 2. Respondent "respectfully recommends that the special master exercise his discretion and determine a reasonable award for attorneys' fees and costs." *Id.* at 3.

Petitioner has filed no reply and the motion is now ripe.

## II
## LEGAL STANDARD FOR AWARDING ATTORNEYS' FEES AND COSTS

Special masters have the authority to award "reasonable" attorneys' fees and litigation costs in Vaccine Act cases. § 300aa-15(e)(1). This is true even when a petitioner is unsuccessful on the merits of the case, if the petition was filed in good faith and with a reasonable basis.[10] *Id.*

---

[6] This figure is slightly inconsistent with the actual billing records.  When calculating Mr. McHugh's billing totals based on the yearly totals included in this billing records, I find that Mr. McHugh included minor errors in the calculation of his 2013, 2015, 2016, 2017, and paralegal work hours.  Although Mr. McHugh's records show total billing of $292,389.00 (ECF No. 362-3, p. 7), the actual total based on the hours and rates listed in the billing records should be $292,403.00, a difference of $14.00.  Combined with Mr. Gaynor's $61,129.00 in requested fees, the overall figure cited in the motion should have been $353,532.00.

[7] Petitioner indicates that there is currently a legal dispute between Mr. McHugh's office and Ms. Sturm. (ECF No. 362, p. 19.)

[8] Petitioner has not delineated whether any additional costs were borne by petitioner as is required by General Order No. 9.

[9] I also note that current counsel of record was not substituted in as counsel in this case until January 7, 2010. (ECF No. 75.)

[10] Section 15(e) of the Vaccine Act sets out the relevant provisions regarding attorneys' fees and costs:

> In awarding compensation on a petition filed under section 300aa-11 of this title the special master or court shall also award as part of such compensation an amount to cover –
> (A) reasonable attorneys' fees, and

"The determination of the amount of reasonable attorneys' fees is within the special master's discretion." *Saxton v. HHS*, 3 F.3d 1517, 1520 (Fed. Cir. 1993); *see also Shaw v. HHS*, 609 F.3d 1372, 1377 (Fed. Cir. 2010).

Whether a claim is brought in "good faith" is a subjective determination, long understood as requiring an "honest belief" that a claim is appropriate for compensation. *See, e.g., Chronister v. HHS*, No. 89-41V, 1990 WL 293438, *1 (Fed. Cl. Spec. Mstr. December 4, 1990). The standard for finding good faith has been described as "very low," and findings that a petition lacked good faith are rare. *Heath v. HHS*, No. 08-86V, 2011 WL 4433646, *2 (Fed Cl. Spec. Mstr. Aug. 25, 2011). In fact, it has been said that petitioners are entitled to a presumption of good faith absent direct evidence of bad faith. *Grice v. HHS*, 36 Fed. Cl. 114, 121 (Fed. Cl. 1996).

The question of whether a claim has a "reasonable basis" is objective, and must be affirmatively established by the petitioner. *McKellar v. HHS*, 101 Fed. Cl. 297, 305 (Fed. Cl. 2011). The claim of a "reasonable basis" must be supported by more than "unsupported speculation." *Perreira v. HHS*, 33 F.3d 1375, 1377 (Fed. Cir. 1994). Rather, to have a reasonable basis, a claim must be supported, at a minimum, by medical records or medical opinion. *Chronister*, 1990 WL 293438 at *1.

Further, as to all aspects of a claim for attorneys' fees and costs, the burden is on the *petitioner* to demonstrate that the attorneys' fees claimed are "reasonable." *Sabella v. HHS*, 86 Fed. Cl. 201, 215 (2009); *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *Rupert v. HHS*, 52 Fed. Cl. 684, 686 (2002); *Wilcox v. HHS*, No. 90-991V, 1997 WL 101572, at *4 (Fed. Cl. Spec. Mstr. Feb. 14, 1997). The petitioner's burden of proof to demonstrate "reasonableness" applies equally to costs as well as attorneys' fees. *Perreira v. HHS*, 27 Fed. Cl. 29, 34 (1992), *aff'd,* 33 F.3d 1375 (Fed. Cir. 1994).

One test of the "reasonableness" of a fee or cost item is whether a hypothetical petitioner, who had to use his own resources to pay his attorney for Vaccine Act representation, would be willing to pay for such expenditure. *Riggins v. HHS*, No. 99-382V, 2009 WL 3319818, at *3 (Fed. Cl. Spec. Mstr. June 15, 2009), *aff'd by unpublished order* (Fed. Cl. Dec. 10, 2009), *aff'd,* 406 Fed. App'x. 479 (Fed. Cir. 2011); *Sabella v. HHS*, No. 02-1627V, 2008 WL 4426040, at *28 (Fed. Cl. Spec. Mstr. Aug. 29, 2008), *aff'd in part and rev'd in part,* 86 Fed. Cl. 201 (2009). In this regard, the United States Court of Appeals for the Federal Circuit has noted that:

---

(B) other costs, incurred in any proceeding on such petition. If the judgment of the United States Court of Federal Claims on such a petition does not award compensation, the special master or court may award an amount of compensation to cover petitioners' reasonable attorneys' fees and costs incurred in any proceeding on such petition if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought.

§300aa-15(e)(1).

> [i]n the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.

*Saxton*, 3 F.3d at 1521 (emphasis in original) (quoting *Hensley*, 461 U.S. at 433-34). Therefore, in assessing the number of hours reasonably expended by an attorney, the court must exclude those "hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obliged to exclude such hours from his fee submission." *Hensley*, 461 U.S. at 434; *see also Riggins*, 2009 WL 3319818, at *4.

## III
## THERE WAS NO REASONABLE BASIS IN THIS CASE TO PURSUE AN APPEAL TO THE COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Given that this was an extensively litigated case with a multitude of contested factual issues, I find that it was reasonable for petitioner to pursue a motion for review to the Court of Federal Claims to test the merits of Special Master Vowell's decision. However, given the failure to reveal *any* abuse of discretion upon motion for review, and given the nature of the arguments before the Federal Circuit, I do not find that it was reasonable for petitioner to pursue the claim further following Judge Braden's December 18, 2015, decision.

### A.   *Reasonable basis can be lost as a case moves forward*

Even when there was originally a sufficiently reasonable basis for filing a claim, counsel has an ongoing obligation to determine whether it is still reasonable to pursue the claim. *Browning v. HHS*, No. 02-929V, 2010 WL 3943556, at *12 (Fed. Cl. Spec. Mstr. Sept. 27, 2010). Special masters have denied fees for counsel's work beyond a point where further pursuit of a claim was no longer reasonable. *See, e.g., id.* at *14 (denying fees when reasonable basis ceased because petitioner lacked factual evidence to address statutory requirements); *Perreira*, 33 F.3d at 1375 (denying fees incurred at hearing when petitioner's counsel knew his expert's opinion was legally insufficient); *Stevens v.HHS*, No. 90-221V, 1992 WL 159520 (Cl. Ct. June 9, 1992), *aff'd*, 996 F.2d 1236 (Fed. Cir. 1993) (denying fees and costs where the petition no longer had a reasonable basis for compensation).

In determining whether reasonable basis exists, the presiding judge or special master looks to the totality of the circumstances and factors in "the factual basis, the medical support, and jurisdictional issues, and the circumstances under which a petition is filed*." Curran v. HHS*, 130 Fed. Cl. 1, 5 (2017). The reasonable basis question is not a "one-time inquiry" that considers only whether reasonable basis existed at the outset of a case, but rather an *ongoing* inquiry as the case proceeds. *Chuisano v. United States*, 116 Fed. Cl. 276, 288 (2014). Therefore, a "special master acts within his or her discretion when revisiting the reasonable basis inquiry if such reconsideration is warranted by changed circumstances during the proceedings." *Id.* (citing *Perreira*, 33 F.3d at 1377).

Fees and costs may be denied where petitioner's counsel should have understood that further appeal of a decision would be completely fruitless, particularly where the decision was wholly fact-based and depended entirely on the special master's view of the credibility of the fact witnesses. *Phillips v. HHS,* 988 F.2d 111, 112 (Fed. Cir. 1993) (Plager, J., concurring). The Federal Circuit has stated, "it is a waste of time and resources to attempt to have this court overturn the judgment of the Court of Federal Claims in a case . . . in which the only issue turns on fact-finding and credibility determinations." *Id.* at 112-13. Further, the "appropriateness of an award of fees related to the initial proceedings before the special master is an issue quite separate from the appropriateness of fees attributable to an appeal to the [the Federal Circuit]." *Id.* at 113.

Counsel has a duty to avoid frivolous litigation, and should use "reasoned judgment in determining whether to . . . pursue a claim." *Murphy v. HHS*, 30 Fed. Cl. 60, 62 (1993), *aff'd*, 48 F.3d 1236 (Fed. Cir. 1995). However, "the [Vaccine] Program's interest in promoting attorney representation in vaccine cases, as contemplated by the attorneys' fees provision of the statute, must be balanced carefully against the court's examination of the reasonableness of the basis for bringing the vaccine petition." *Turner v HHS*, No. 99-544V, 2007 WL 4410030, at *11 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Although counsel has an "ethical obligation to be a zealous advocate," it does not give counsel a "blank check to incur expenses without regard to the merits of [the] claim." *Perreira*, 27 Fed. Cl. at 34-35. "[C]ounsel who choose to pursue basically hopeless appeals of Program decisions, especially those turning on credibility determinations, should not be surprised to find that the Program will not compensate their time spent upon such appeals." *Johnson v. HHS*, 1992 WL 247565, at *2 (Fed. Cl. Spec. Mstr. Sept. 14, 1992).

**B.  There was no reasonable basis to proceed in this case following Judge Braden's decision denying petitioner's motion for review**

In this case, Special Master Vowell's decision denying entitlement, and the accompanying ruling on petitioner's motions *in limine*, spanned 219 pages and exhaustively discussed a multitude of factual issues. (ECF Nos. 319-320.)  Among Special Master Vowell's findings, she concluded that A.K. did not have any underlying mitochondrial disorder and that A.K.'s autism pre-dated the influenza vaccinations that formed the basis of petitioner's claim.[11] Petitioner's claims -- that A.K. suffered an underlying mitochondrial disorder (aggravated by his vaccinations) and that his autism arose as a later consequence *following* his two influenza vaccinations -- were fundamental factual predicates underpinning petitioner's theory of the case.

On appeal to the Federal Circuit, petitioner challenged these two fact-intensive conclusions by Special Master Vowell.  (*See* Brief of Petitioners-Appellants, 2016 WL 3090232.)  Obviously, however, petitioner first tested the validity of these determinations on a motion for review.  Petitioner's motion for review was decided by Judge Braden on December

---

[11] This description functions only as a summary.  Each of these two conclusions is, of course, the culmination of a number of more specific points which were evaluated by both Special Master Vowell and Judge Braden.

18, 2015. (ECF No. 341.)  Upon review, Judge Braden did not identify *any* instance in which Special Master Vowell abused her discretion in weighing the record evidence.[12]

In pertinent part, Judge Braden held that "the Special Master properly determined that Petitioners failed to establish the second and third elements [of *Althen*], because A.K. showed 'signs of both ASD and speech delay well before receiving . . .influenza vaccinations.'" (ECF No. 341, p. 17.) Judge Braden further held that "[t]he Special Master's determination that A.K.'s ASD predated the influenza vaccinations was not arbitrary and capricious.  It is clear from the September 28, 2015 Decision that the Special Master based findings of fact about this issue by weighing the credibility of both parties' experts, analyzing medical records and related evidence, and personally viewing the home videos of A.K."  (*Id.*)

With regard to the argument that Special Master Vowell incorrectly concluded that A.K. did not have any mitochondrial disorder, Judge Braden ruled that petitioner had not met his burden to provide preponderant evidence that A.K. suffered a mitochondrial disorder. (ECF No. 341, p. 17.) Specifically, Judge Braden opined that:

> [T]he Special Master carefully considered the testimony of Petitioners' expert, Dr. Kendall.  In addition, the Special Master took into consideration that, on cross examination, Dr. Kendall contradicted her report by conceding that she could not conclude that A.K. definitively had mitochondrial disorder. The Special Master also examined A.K.'s lab results and medical literature proffered.  Therefore, the Special Master "considered the relevant evidence of record, [drew] plausible inferences, and articulated a rational basis for the decision."

(*Id.* at 17 (quoting *Lampe v. HHS*, 219 F.3d 1357, 1360 (Fed Cir. 2000) (internal citations omitted)).

I have reviewed both Special Master Vowell's and Judge Braden's decisions, and I find that it was *not* reasonable for petitioner to attempt to overturn Special Master Vowell's factual determinations at the Federal Circuit.[13]  As petitioner notes in the instant motion, the record of

---

[12] Judge Braden did hold that Special Master Vowell made an error, not in her weighing of the evidence, but in her application of *Althen* prong 1. (ECF No. 341, p. 17.)  This is a point raised by petitioner as support for the contention that appeal to the Federal Circuit was reasonable.  (ECF No. 362, p. 9.)  Specifically, petitioner cites this point as evidence that "given the strength of their case on causation, it was plainly not unreasonable for them to seek review of the special master's finding in the Court of Federal Claims and then in the Federal Circuit." (*Id.*) I stress, however, that Judge Braden did not reach the further question of the significance of Special Master Vowell's approach to *Althen* prong 1, because Special Master Vowell's determinations regarding *Althen* prongs 2 and 3 were dispositive. (*Id.*)  Thus, it is important to note that Judge Braden's decision in no way suggests that petitioner met the burden under *Althen* prong 1.  That question was *not* reached.

[13] I also note that petitioner has reiterated the facts of this case in their motion by way of describing their reasonable basis for pursuing the claim. (ECF No. 362.)  I have reviewed petitioner's recitation of the factual basis for petitioner's claim in the motion and find that petitioner has mostly begged the question of whether petitioner's interpretation of the factual basis for the claim is reasonable.  For example, petitioner states that the claim was supported by "reports of several treating physicians regarded as among the very few experts in mitochondrial

this case was "extensive" and included records from several treating physicians as well as opinions by testifying experts.  (ECF No. 362, p. 3.)  And, as Judge Braden noted, Special Master Vowell's analysis also included her own review of extensive video evidence filed in the case. (ECF No. 341, p. 17.)   It was not reasonable for petitioner to expect the Federal Circuit to *reweigh* the extensive evidence bearing on these points, which had already been twice addressed at length by the lower court, first by Special Master Vowell and later by Judge Braden.[14]  It is well established that the Federal Circuit will not readily overturn factual determinations in Vaccine cases.  *See, e.g.* ECF No. 341, p. 18 (Judge Braden quoting the Federal Circuit statement in *Munn v. HHS*, 970 F.2d 863, 871 (Fed. Cir. 1992) that "of course we do not examine the probative value of the evidence or the credibility of the witnesses.  These are all matters within the purview of the fact finder."); *see also Doe v. HHS*, 601 F.3d 1349, 1355 (Fed. Cir. 2010)(noting that "because of the special master's unique position to see the witnesses and hear their testimony," the special master's credibility assessments are "virtually unreviewable on appeal."); *Lampe,* 219 F.3d at 1362 (noting the "exacting arbitrary and capricious standard of review that applies to factual findings in Vaccine Act cases.").

Of course, petitioner also argued before the Federal Circuit that the above-cited standard of review is unconstitutional.  (ECF No. 362, p. 13; Petitioner-Appellant Brief, 2016 WL 3090232.)  This seemingly novel argument advanced by petitioner does not persuade me that the appeal had a reasonable basis.  First, the argument was summarily rejected without opinion. Petitioner notes that in prior cases attorneys' fees have been awarded for appeals that were denied without opinion.  (ECF No. 362, p. 10 (citing *Davis v. HHS*, 105 Fed. Cl. 627 (2012).)  Specifically, petitioner urged that "[t]he test is whether the petitioners had a reasonable basis to proceed, not whether the appellate court found the case easy to decide."  (ECF No. 362, p. 10.) In the specific context of this case, however, the question of petitioner's reasonable basis is not as easily divorced from the circuit's actual determination of the appeal as petitioner suggests. Although I do *not* find the fact that the appeal was dismissed without opinion is *dispositive*, I do find that it constitutes *some* evidence that petitioner's appeal lacked a reasonable basis in the first instance.  This is particularly so, because the same counsel presented similar constitutional arguments in another vaccine case which was previously rejected in a written opinion by the

---

malfunction world-wide, who agreed that A.K. suffered from mitochondrial malfunction." (ECF No. 362, p. 3.) However, Special Master Vowell was clear in her finding that the treating physician reports cited by petitioner do not have the significance petitioner asserts.  Although she noted the reports provide "some support" for petitioner, she specifically observed that "although these records contain extensive clinical histories, the physicians who took the histories largely declined to assign diagnostic significance to the clinical symptoms reported.  This is unsurprising, in that these records do not represent the independent diagnoses that petitioners claim they do." (ECF No. 320, p. 64, 67.)  Petitioner also persists in asserting that the government's Rule 4 report filed in *Poling v. HHS* provides evidentiary support for petitioner's theory. (ECF No. 362, p. 3.)  Special Master Vowell extensively dismantled petitioner's misapprehension of the *Poling* case as well as the misapplication of judicial estoppel. (ECF No. 319, pp. 19-37.)  Judge Braden similarly considered and rejected petitioner's *Poling* claims upon review. (ECF No. 341, p. 18.)

[14] It is also worth stressing that *both* of these determinations – that A.K. did not have any mitochondrial disorder and that his autism predated his vaccinations – were core to petitioner's claim, and petitioner would have had to have prevailed on both points in order to change the outcome of the case, making the challenge before petitioner *doubly* difficult.

circuit. *See Milik v. HHS*, 822 F.3d 1367.  Indeed, Mr. Gaynor's billing records show that petitioner first tried to have this case joined with *Milik* before the Federal Circuit, before later seeming to find it necessary to research whether *Milik* would have a *stare decisis* impact on the instant case. (ECF No. 362-5, pp. 11-12.)  Thus, the Federal Circuit's silence suggests that, following *Milik*, petitioner did not present any *significant* legal issue requiring the court's further attention.

Second, even in the unlikely event the Federal Circuit overturned its own precedent and applied a different standard of review, and even if the circuit considered the factual issues *de novo*, there is still no reason based on the existing record to *speculate* that the Federal Circuit would have reached a different conclusion than Special Master Vowell on the underlying factual questions at issue.  Upon my own review of Special Master Vowell's and Judge Braden's decisions, I find that the weight of evidence going to core aspects of petitioner's claim leaned so far *against* petitioner's claim that such an outcome would be *highly unlikely*.[15]

## C.  *Petitioner's request for attorneys' fees and costs is reduced for all costs and billings associated with petitioner's appeal to the Federal Circuit*

Since I find that petitioner's appeal to the Federal Circuit was not reasonable, I will not compensate petitioner for attorneys' fees and costs associated with, or stemming from, the appeal.  Upon my review of the billing records in this case, this results in the following reductions:  **14.7 hours** of billing by Mr. McHugh from March 18, 2016 through December 9, 2016; **$13,517.93** in costs associated with the appeal claimed by Mr. McHugh[16]; **146.2 hours** (*i.e. all* hours) billed by Mr. Gaynor as appellate counsel[17]; and *all* costs (**$778.95**) incurred by Mr. Gaynor.

---

[15] I stress that petitioner has an unquestioned and absolute right to pursue their claim as far as legally possible.  However, the issue here is *not* whether petitioner was within his rights to appeal.  The issue is whether the tax-payer funded Vaccine Program should be required to reimburse petitioner for the expenditure in doing so.  Fee shifting regimes have limits and the Vaccine Program is not compelled to pay for all litigation efforts no matter how quixotic.  As noted above, one test of the "reasonableness" of a fee or cost item is whether a hypothetical petitioner, who had to use his own resources to pay his attorney for Vaccine Act representation, would be willing to pay for such expenditure. *Riggins*, 2009 WL 3319818, at *3.  Here, notwithstanding petitioner's *own* zealousness, I do not find that a hypothetical reasonable petitioner would have borne the expense of an appeal such as this.

[16] This includes all charges by Counsel Press, Inc. for the printing of petitioner's appellate briefs as well as a Fed Ex. Charge and one night's stay at a Washington, D.C. area Hilton. (ECF No. 362-4.)

[17] Mr. Gaynor's first billing in this case is on May 11, 2016, well after Judge Braden issued her decision on the motion for review.  I have reviewed his billing records (ECF No. 362-5, pp. 10-12) and all of his work is attributable to the appeal, except for 15.5 hours in 2017 reflecting work on the instant fee motion. At least some of that time was spent preparing Mr. Gaynor's own billing records and declaration, activities that would not have been necessary if he had not engaged in the underlying work that I have found to be unreasonable.  To the extent that any of his hours could be attributed to petitioner's motion papers, I find that such involvement was excessive and redundant.  Mr. McHugh additionally billed 7.5 hours working on the fee application. (ECF No. 362-3, p. 6.)  Petitioner's motion sets forth only basic Vaccine case law and mostly deals with the history and factual allegations of this case which could have been more efficiently addressed directly by counsel of record.  Mr. Gaynor's involvement was unnecessary.  In short, I find Mr. Gaynor's participation in this case unreasonable *in toto*.

# IV
# THE HOURS BILLED IN THIS CASE ARE *CLEARLY* EXCESSIVE

Having already received $459,108.12 to cover fees and expenses incurred through the *close* of the hearing in this case, petitioner now requests compensation for 1,551.9 hours in just the *post-hearing* litigation of this case.  Having reduced petitioner's request by the 160.9 hours attributable to their appeal to the Federal Circuit, a *stunning* 1,391 hours remain.  I stress, these 1,391 hours reflect only a *fraction* of the overall history of litigation in this case.  *This simply shocks the conscience.* Accordingly, these hours are reduced as described below.

## A.  The hours billed for petitioner's motion for review must be reduced

Mr. McHugh spent 153.5 hours in 2015 working on petitioner's motion for review.[18] (ECF No. 362-3, pp. 5-7.)  I find these hours *excessive* for several reasons and reduce the requested hours by 50%.

First, this reduction brings this case in line with other cases with complicated histories where a motion for review was pursued. *See, e.g. Caves v. HHS*, No. 07-443V, 2012 WL 6951286, at *8-9 (Fed. Cl. Spec. Mstr. Dec. 20, 2012) (noting that a 30-page motion for review was completed in 49.8 attorney hours); *Doe/11 ex rel Child Doe/11 v. HHS*, 89 Fed. Cl. 661, 667 (Fed Cl. Nov. 10, 2009) (finding 160.2 hours of attorney work reasonable for prosecuting *two* motions for review); *Morse v. HHS*, 93 Fed Cl. 780, 793 (Fed Cl. July 26, 2010) (noting that a survey of fee awards for motions for review showed billings of between of 6.25 and 80 hours per instance).

Notwithstanding that the record of this case was unusually large, petitioner's counsel should have mastered the facts and arguments of this case during the prior litigation and, at this stage in the litigation, the briefing process should have been streamlined.[19]  Although the arguments contained in the motion for review are couched as objections to Special Master Vowell's reasoning, they largely *retread* issues and concepts extensively addressed in petitioner's 136-page post-hearing brief (ECF No. 297) and 26-page post-hearing reply brief (ECF No. 302).  That is, petitioner's motion for review includes extensive discussion of factual allegations *already addressed* in the prior motions, including extensive use of block quotes of expert reports.[20]

---

[18] Mr McHugh represents in the motion that he spent 153.4 hours on petitioner's motion for review. (ECF No. 362, p. 18.)  Upon review of his billing records, however, I tally 153.5 hours attributable to this work. (ECF No. 362-3, pp. 6-7.)

[19] I note that petitioner filed a three-page "motion for review" (ECF No. 328) with an accompanying but separately filed 63-page memorandum in support of the motion (ECF No. 329).  For purposes of this decision I refer to the two documents together as the motion for review.

[20] This is not to suggest that petitioner was wrong to brief the facts of the case before Judge Braden, only that it should not have taken 153.5 hours to do so.

Additionally, I also note that by Mr. McHugh's own characterization, these 153.5 hours came on the heels of an already *egregious* 500 hours of work by him during the immediately preceding post-hearing phase before Special Master Vowell.  (ECF No. 362, p. 18.)  This work included "work on post-hearing motions, post-hearing expert submissions and replies, the post-hearing memorandum, and the reply post-hearing memorandum." (*Id*.)  And indeed, upon my review of the billing records, I observed that the great majority of those hours were spent on the post-hearing briefing. (ECF No. 362-3.)  Ms. Sturm billed a *further* 645 hours for similar work performed during the same period. (ECF No. 363-1.)

Moreover, I also find that the hours spent on petitioner's motion for review should be reduced, because the final work product was *very poor* in that it included *misrepresentations* of the decision to be reviewed, as well as including *frivolous* and *inflammatory* arguments.[21]  *See, e.g., Masias v. HHS*, No. 99-697V, 2010 WL 1783542, at *5 (Fed. Cl. Spec. Mstr. April 14, 2010) (making a downward adjustment to a lodestar determination where "the quality of advocacy did not satisfy the Court's expectations.").

For example, with regard to the proper standard for diagnosing a mitochondrial disorder, petitioner argued that "the SM imposed diagnostic criteria upon the field of mitochondrial medicine, a medical specialty that has refused to adopt such fixed diagnostic criteria." (ECF No. 329, p. 23.)  However, this assertion is explicitly contradicted by the entitlement decision in this case.  Special Master Vowell wrote an extensive analysis of the diagnostic criteria for mitochondrial disorders, explaining that both petitioner's and respondent's experts agreed that there is no gold standard diagnostic criteria and explicitly stating that "I stress that I am not adopting a strict application of the Bernier criteria in lieu of accepting Dr. Kendall's opinion, but rather assessing the credibility and persuasiveness of her opinion regarding the appropriate diagnosis for A.K. in light of, *inter alia*, her claimed application of the Bernier criteria."[22] (ECF No. 320, p. 52.)

In another passage, Special Master Vowell observed that certain mitochondrial disorder diagnoses listed in the medical records did not constitute separate, independent, or corroborating diagnoses. (ECF No. 320, pp. 65-66.)  She observed that the medical records in question did not report any application of the relevant diagnostic criteria or any evaluation of prior test results. (*Id*.)  She also observed that both respondent's and petitioner's mitochondrial disorder experts testified that it is not uncommon for doctors in this field to accept another specialist's diagnosis. (ECF No. 320, pp. 65-66.)  Based on that analysis, petitioner's motion for review -- quite ridiculously -- accused Special Master Vowell of *slander* against these physicians. (ECF No. 329, p. 28.)

---

[21] I note that petitioner's motion for review included many arguments, and I stress that I am *not* suggesting that *all* of petitioner's arguments were frivolous.  However, the fact that the motion include *some* frivolous arguments bears on the reasonableness of the hours expended in drafting it.

[22] Indeed, Special Master Vowell explained that it was petitioner's own expert who introduced the Bernier criteria into the record of the case in the first place. (ECF No. 320, p. 20, fn. 42, p. 49.)

In perhaps the most egregious example, petitioner intimated in the motion for review that Special Master Vowell, despite her long judicial career, was not qualified to evaluate the opinion presented by their pediatric development expert, because she is not, among other things, "a parent of boys." (ECF No. 329, p. 17.)  Seeking to interject and leverage an *ad hominem* critique of the fact finder's personal life is not effective advocacy.[23]

Even in the instant motion for attorneys' fees and costs, petitioner continues these hyperboles, characterizing Special Master Vowell's decision as "deem[ing] all evidence presented by the petitioners to be unconvincing based upon her view that no expert who examined A.K. had followed proper procedure, nor did any author of any study cited." (ECF No. 362, p. 9.)  This is clearly a *gross mischaracterization* of the entitlement decision in this case.  It is no secret that zealous representation may include providing a partisan gloss on the facts and circumstances of a case, but petitioner's persistent and repeated hyperboles, which are suggestive of an inability or unwillingness to grapple with the extensive and nuanced factual findings in this case, are not helpful in resolving the issues in this case and time devoted to them should not be compensated.

Thus, in light of the above, Mr. McHugh's 2015 hours spent prosecuting the motion for review in this case are reduced by 50% -- that is, by **76.75 hours**.

**B.  Hours spent remedying petitioner's expert's untimely submission of medical literature will not be compensated**

Upon my review of the billing records, I find that Mr. McHugh and Ms. Sturm have billed for time spent rectifying an untimely submission of medical literature in the midst of the hearing in this case.  Specifically, Mr. McHugh billed 15.5 hours in 2013 attributable to the consequences of an untimely submission by Dr. Deth, including review of a responsive supplemental report by respondent's expert, Dr. Johnson, and a further responsive report by Dr. Deth. (ECF No. 362-3, pp. 1-2.)  Ms. Sturm billed an additional 1.4 hours correcting this issue. (ECF No. 363-1.)  I will not compensate counsel for these hours.

In her pre-hearing order, Special Master Vowell took extraordinary efforts to avoid the introduction of late-filed medical literature or other evidence during the course of the hearing in this case.  (ECF No. 199.)  She observed that "the attempt to introduce late-filed medical literature causes unnecessary delays and diminishes the quality of the hearing testimony." (*Id.*)  She ordered the attorneys to provide each expert with a letter – attached to the pre-hearing order – which explained that "some hearings (and the resolution of the issues involved therein) have been needlessly complicated by the tendency of some expert witnesses to produce additional medical literature at or immediately before the date of the hearing.  Delays ensue because the attorneys for both sides, opposing experts, and the special master do not have sufficient time to become conversant with the newly-filed medical literature." (ECF No. 199-1.)

---

[23] Moreover, this line of argument is as wrong as it is inappropriate.  Special Master Vowell has a son.

Despite having received one of these cautionary letters, petitioner's expert, Dr. Deth, accompanied his testimony with a video slide show containing citations and references to unfiled medical literature. (ECF No. 199-1; Tr. 633-38.)  Counsel had apparently failed to properly prepare their witness or vet his presentation, as the transcript clearly shows that Dr. Deth was unaware that his presentation constituted evidence in this case, and that counsel was unaware that the presentation contained references to unfiled literature.[24]  (Tr. 633-37.)

Following the hearing, Special Master Vowell ordered that petitioner file the literature for her evaluation, and also provided that respondent have an opportunity to respond in writing. (ECF No. 257.)  In response to the order, petitioner filed 25 documents marked as slide references from Dr. Deth's presentation on May 31, 2013.[25]  (ECF Nos. 260-62.)  On August 28, 2013, respondent filed a supplemental expert report by Dr. Johnson responding to the late-filed literature. (ECF No. 276.)  Petitioner filed a responsive report by Dr. Deth on October 8, 2013. (ECF No. 281.)

Mr. McHugh's billing of 15.5 hours, as well as Ms. Sturm's billing of 1.4 hours, to rectify petitioner's expert's disregard of Special Master Vowell's pre-hearing order does not represent appropriate billing judgment.  *See, e.g.*, *Saxton*, 3 F.3d at 1521 (noting that "hours that are not properly billed to one's client also are not properly billed to one's adversary").  Given that petitioner's counsel had clear notice of Special Master Vowell's order and expectation regarding late-filed medical literature, it is unlikely they would be emboldened to charge a client for extra work caused by the predictable consequences of their *inadequate* trial preparation. Therefore, I reduce petitioner's requested attorney hours by these amounts. *Yang v. HHS*, No. 10-33V, 2013 WL 4875120, at *5 (Fed. Cl. Spec. Mstr. Aug. 22, 2013) (holding that "petitioner's counsel's requests for attorneys' fees for work that was created by counsel's mistakes are unreasonable.")

Thus, Mr. McHugh's 2013 billing is reduced by **15.5 hours** and Ms. Sturm's 2013 billing is reduced by **1.4 hours**.

### C.  Hours spent for petitioner's post-hearing submissions are grossly excessive

From May 2, 2013, to August 21, 2015 (the last entry before preparation of petitioner's motion for review), Mr. McHugh billed 513.9 hours. (ECF No. 362-3, pp. 1-5.) After accounting for the above-discussed reduction regarding Dr. Deth's untimely submission, 498.4 hours of billing remain.  During the same phase of this case, Ms. Sturm billed 645 attorney hours from May 6, 2013, to July 11, 2014. (ECF No. 363-1.) With the above reduction of 1.4 hours, her total billing for that period is 643.6 hours.  Again, although the record of this case was extensive, over 1,000 hours of time (1,142 hours) to complete post-hearing briefing and wrap up the case after the closing of the evidentiary record, is *clearly excessive*.  I find that a 50% reduction in Mr.

---

[24] During the presentation, respondent's counsel requested that exhibit numbers be provided as medical literature was referenced.  Petitioner's counsel offered to create a list of exhibit numbers based off the presentation during a recess, only to return from the recess to reveal that some of the literature had not been previously filed. (Tr. 633-34.)

[25] Special Master Vowell had instructed that the articles be assigned exhibit designations, which petitioner failed to do. (ECF No. 319, p. 16.)

McHugh's hours and a 60% reduction in Ms. Sturm's hours is reasonable and appropriate.  This conclusion is supported by a number of factors.

### 1.  Inappropriate billing

First, there are clear examples of overbilling in this case.  For example, I note that petitioner's counsel – Mr. McHugh and Ms. Sturm alike – billed significant hours between the filing of their post-hearing reply brief on June 16, 2014, and the filing of Special Master Vowell's decision on September 28, 2015, a period during which the case should have been essentially dormant from the parties' perspective.  This work was largely devoted to efforts to reopen the record of the case as well as researching confidentiality issues surrounding the *Poling* case, issues which would appear to stem from petitioner's *much* earlier motion, filed over a year earlier in April of 2013, seeking to leverage the government's report in the *Poling* case via judicial estoppel.  Indeed, Ms. Sturm billed 1.7 hours in June of 2014 described as "Draft of mt. for judicial estoppels section."  In July of 2015, Mr. McHugh billed 5.2 hours for the review of a decision in an unrelated vaccine case.[26]  In this regard, I note that Mr. McHugh does have a history of overbilling for questionable activities.  In *Mostovoy v. HHS*, 2016 WL 720969 (Fed. Cl. Spec. Mstr. Feb. 4, 2016), another protracted autism case prosecuted by Mr. McHugh, Chief Special Master Dorsey reduced an *interim* request for attorneys' fees of approximately $465,000.00 by over $150,000.00.  Among her findings, the Chief Special Master determined that Mr. McHugh had improperly billed, without explanation, 24 hours of fundraising work.  *Mostovoy*, 2016 WL 720969, at *6.

### 2.  Unnecessary and late scientific research

Moreover, petitioner's post-hearing billing includes significant hours seemingly devoted to *new* research into medical issues *after* the close of the evidentiary record.  This work resulted in multiple motions to reopen the record of the case.  Importantly, however, Special Master Vowell noted in her September 28, 2015, ruling on petitioner's evidentiary motions that these efforts were frivolous and did not contribute to the resolution of the case.  Specifically, she described counsel's efforts as follows:

> Petitioners' counsel did not appear to understand that closing the record (which was not done until long after the hearing) meant that no further evidence should be filed, absent truly extraordinary circumstances.  Petitioners never adequately explained in any of their requests to file medical journal articles (and often, not even new published articles) why reopening the record to consider this evidence was truly necessary to a fair trial or a just result.  I cannot identify even one of the articles filed after the evidence was closed that was not either cumulative of the evidence already presented or which was truly late-breaking and highly significant.

---

[26] Petitioner's counsel's billing records identify the case only as "Halt v. Secretary," but likely intended to reference the *Holt* decision filed by Special master Vowell in June of 2015.

(ECF No. 319, p. 18.)

### 3. Hours reflecting over-litigation and reliance on Dr. Deth

I also note that the billing records submitted with petitioner's fee application additionally reflect, even in this post-hearing phase, a continuation of a clear pattern of unreasonable over-litigation in this case.  Specifically, as they prepared their post-hearing briefs, petitioner's counsel billed *extensively* with regard to researching and writing issues surrounding Dr. Deth's testimony and issues related to the subject matter to which he testified.  Yet, it should have been apparent to petitioner's counsel following the hearing that Dr. Deth's testimony and opinion would not be particularly helpful in resolving the case.

Indeed, Special Master Vowell included the following admonition in her entitlement decision: "I note in particular that, despite my cautions that I did not intend to permit re-litigation of the same evidence presented in the OAP test cases, much of Dr. Deth's presentation merely recycled a theory of sulfur metabolism that was rejected during the OAP theory 2 test cases.  Moreover, the entirety of Dr. Deth's presentation was undercut by his clear lack of candor and credibility." (ECF No. 320, p. 133.)  If petitioner's counsel had believed prior to the hearing, despite Special Master Vowell's warning, that Dr. Deth's testimony would be useful, counsel certainly should not have carried that view forward in the wake of the hearing.  Special Master Vowell specifically noted several times during the hearing that Dr. Deth was attempting to testify beyond his expertise. (ECF No. 320, p. 25, n. 61.)  Thus, his short-comings as a witness should have been evident at the conclusion of the hearing.

And, in any event, petitioner's counsel acknowledged prior to presenting Dr. Deth's testimony that his opinion was not necessary to the case.  Specifically, Ms. Sturm stated that "I would like to say that we're offering Dr. Deth's testimony as part of our medical theory, and our position is that we have enough evidence without Dr. Deth's testimony, which is sufficient under prong 1 of *Althen*, which is a plausible medical theory.  Because the issue of oxidative stress has been raised and/or published in the decisions, we believe it's both appropriate and prudent to offer Dr. Deth's testimony on oxidative stress on our direct case, even though it is testimony that delves into mechanism, which is not necessarily required under the law."[27]  Tr. 597.

### 4. Billing redundant of trial preparation

I also observed that petitioner's counsel – particularly Ms. Sturm – spent significant amounts of time during this post-hearing period reviewing and analyzing medical literature cited by respondent's experts.  However, unlike petitioner, respondent did not file *any* medical literature *during* or *after* the hearing in this case.

---

[27] This acknowledgement is all the more significant where petitioner's subsequent motion for review and appeal to the Federal circuit – discussed above – highlight the extent to which this case suffered severe factual issues related to *Althen* prongs 2 and 3.  Petitioner's over-litigation concerning the theory and mechanism of causation did not, and could not, overcome the factual deficiencies of the case related to prongs 2 and 3.

Of course, it is reasonable for petitioner's counsel to spend some time reviewing these previously submitted materials as part of the brief writing process. Nonetheless, I find that the amount of review and analysis reflected in the billing records is excessive. This review constitutes the bulk of Ms. Sturm's 645 hours.

On this point, I stress that petitioner has already been awarded over $450,000.00 in fees and costs in two prior interim awards for work performed during the hearing in this case and for all the work leading up to it. Since the pre-hearing fees were paid via stipulation, no billing records were submitted. I note, however, that the stipulated amount is very large and that any reasonable trial preparation would *necessarily* include mastery of respondent's experts' reliance materials for purposes of cross-examination. Thus, much of this review is *presumptively redundant*.

### 5.  *Vague and block billing*

Finally, I note that petitioner's counsel's billing records are, despite their descriptiveness, lacking in clarity, and often leave the actual nature of the work being performed unclear. For example, much of Mr. McHugh's time is accounted for as "annotating" various materials in the case. It is not clear what exactly he means by this or how it advanced the case. Other entries discuss "general review of all articles and slides cited in the brief." Still others refer only to "legal argument." There is an entry on May 1, 2014, that suggests that Mr. McHugh spent an entire hour checking a single citation. It says only "check cite." Many entries reflect work on "motions" or "memos" without further description of the document. A great many hours are accounted for simply with billing entries reflecting that work is being performed on petitioner's post-hearing brief and post-hearing reply brief.

### 6.  *Line by line analysis is not practical*

In determining the amount of reasonable hours, a special master has discretion to exclude hours expended that are "'excessive, redundant, or otherwise unnecessary'" based on his or her experience or judgment." *Hocraffer v. HHS*, No. 99-533V, 2011 WL 6292218, at *3 (Fed. Cl. 2011). The fee applicant bears the burden of documenting hours that are reasonable and the special master is not obligated to evaluate a fees petition on a line-by-line basis. *Id*. at *3, 13. Rather, particularly where billing entries are cryptic or inadequately described, the special master may determine whether the claimed hours are reasonable based on her experience and the context of the Vaccine Program. *Wasson v. HHS*, 24 Cl. Ct. 482, 483-84 (Fed. Cl. 1991), *aff'd* 988 F.2d 131 (Fed. Cir. 1993). That is, special masters are permitted to use "a global – rather than line-by-line – approach to determine the reasonable number of hours expended." *Hocraffer*, 2011 WL 6292218, at *13.

In this case, Mr. McHugh's and Ms. Sturm's billing records contain entries that are cryptic and inadequately described. More to the point, however, these 1,142 hours reflect an isolated phase of this litigation. I have separately accounted for petitioner's counsel's billing related to the appeal and the motion for review. Moreover, petitioner's prior stipulation resulted in fees paid through the end of the hearing. Thus, these 1,142 hours reflect only work to

16

complete post-hearing briefing and wrap-up of the case after the closing of the evidentiary record.  The necessary tasks at hand in this phase of the litigation are limited in scope. Moreover, the nature of the tasks and the actual billing entries make it very difficult to specifically parse what research and review is reasonable and what research and review is not. Indeed, many hours billed are accounted for simply as work on the post-hearing briefing.  Thus, a line-by-line analysis is neither practical nor warranted.

In my experience evaluating attorneys' fees and costs in the Vaccine Program, and based upon my careful review of the billing records, the hours billed for this period are clearly excessive, and a reduction of 50% and 60%, respectively, is warranted for Mr. McHugh's and Mr. Sturm's billing. *Accord: Raymo v. HHS*, 129 Fed Cl. 691, 703 (2016) (upholding a special master's 40% reduction in fees and noting that "the special master 'is not required to explain how many hours are appropriate for any given task.'").  Although these reductions appear quite high, this is only because the billing in this case is so *egregiously* high.  This results in the following reductions:

Mr. McHugh:

> **2013: 46.6 hours**
> **2014: 195.8 hours**
> **2015: 6.8 hours**

Ms. Sturm:

> **2013: 123.33 hours**
> **2014: 262.86 hours**

### D.  Ms. Sturm's paralegal hours are vague and excessive

In addition to the above, I further note that Ms. Sturm requested 55 hours of paralegal work for preparation of her fee invoices. (ECF No. 363-1, p. 11.)  Ms. Sturm did not included detailed billing records, but only an explanatory footnote.  (*Id.*)  I find that these requested hours are excessive and not well documented.  A more reasonable amount of time to prepare these invoiced would be 10 hours.  Therefore, I reduced the requested paralegal hours by **45 hours**.

## V
## THE HOURLY RATES CHARGED BY MR. MCHUGH AND MS. STURM ARE EXCESSIVE AND MUST BE REDUCED

As noted in Petitioner's Application for attorney's fees and costs, Petitioner's attorney, Mr. McHugh, has practiced before this court in Vaccine Act cases since 1999. (ECF No. 362-1, p. 2.) Consequently, there is a long history concerning his requested hourly rates, and the rates

that have been authorized by this court.[28]  I am not aware of any prior vaccine case addressing an appropriate hourly rate for Ms. Sturm.  Mr. McHugh and Ms. Sturm prosecuted this case out of Mr. McHugh's New York City office.[29]

## A.  Case law regarding attorneys' hourly rates

### 1.  The Washington DC "forum rate" applies to Mr. McHugh's hourly rate

In *Rodriguez v. HHS*, No. 06-559, 2009 WL 2568468 (Fed. Cl. Spec. Mstr. July 27, 2009), Special Master Vowell rejected Mr. McHugh's requested New York City hourly rate of $450/hr., in favor of the Washington DC "forum rate," which she concluded was substantially lower.  (*Id.* at *16.)  Ultimately, Mr. McHugh received an award based on an hourly rate of $335/hr. for work performed in 2009, and lesser rates for work during previous years. (*Id.* at *23.)

Mr. McHugh filed a motion for review of the *Rodriguez* decision on attorney's fees and costs in the U.S. Court of Federal Claims.  Upon review, Judge Sweeney affirmed the Special Master's decision regarding both Mr. McHugh's and Mr. Gaynor's hourly rates, based on application of the forum rates to the work they had performed.  *Rodriguez v. HHS*, 91 Fed. Cl. 453, 479 (Jan. 22, 2010), *aff'd*, 632 F.3d 1381 (Fed. Cir. Feb. 9, 2011), *cert. denied*, 565 U.S. 1059 (Nov. 28, 2011).  Thus, regardless of Petitioners' request for substantially greater "New York City" hourly rates for Mr. McHugh, this court ruled that during 2009, Mr. McHugh was entitled to $335/hour and that ruling was affirmed.

### 2.  The __McCulloch__ decision propounded a new "forum rate" scale based on attorney experience

In 2015, Special Master Gowen filed a fees decision that provided a detailed discussion of appropriate attorney hourly rates in the Program.  See *McCulloch v. HHS*, No. 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015).  The special master devised a range of hourly rates for Vaccine Act attorneys with varying amounts of legal experience, if such counsel qualified for the Washington D.C. "forum rate." (*Id.* at *19.)

Other special masters have adopted *McCulloch's* range of hourly rates in a multitude of decisions. *E.g.*, *Ericzon v. HHS*, No. 10-103V, 2016 WL 447770, at *2-3 (Fed. Cl. Spec. Mstr. Dorsey Jan. 15, 2016); *Avchen v. HHS*, No. 14-279V, 2015 WL 9595415, at *2 (Fed. Cl. Spec.

---

[28] Indeed, I recently addressed Mr. McHugh's hourly rates in *Hirmiz v. HHS*, No. 06-371V (Fed. Cl. Spec. Mstr. Aug. 29, 2017).  My analysis in this case is substantially the same.  As noted previously, Mr. McHugh has worked in collaboration with Mr. Gilbert Gaynor, who likewise has established a history regarding his hourly rates of pay. Since I have determined that *none* of Mr. Gaynor's billing in this case is compensable, I need not belabor the question of his rates.  I do note in the interest of completeness, however, that Mr. Gaynor's requested rate is *too high*.  A reasonable hourly rate for Mr. Gaynor would be $385 per hour for the work performed in this case, the same rate I awarded Mr. Gaynor in *Hirmiz*. (Although *Hirmiz* addressed only work performed in 2015 and 2016, Mr. Gaynor did not identify an increased rate for 2017 for this case. (ECF No. 362-5.).)

[29] Ms. Sturm operated as an independent contractor. (ECF No. 362-6.)

Mstr. Moran Dec. 4, 2015); *Houck v. HHS*, No. 11-509V, 2015 WL 9259889, at *1-2 (Fed. Cl. Spec. Mstr. Hamilton-Friedman Nov. 25, 2015); *Tomlinson v. HHS*, No. 13-736V, 2015 WL 7068558, at *3 (Fed. Cl. Spec. Mstr. Millman Oct. 23, 2015); *Dixon v. HHS*, No. 13-022V, 2015 WL 8718278, at *2 (Fed. Cl. Spec. Mstr. Corcoran Nov. 23, 2015); see also *Mehner v. HHS*, No. 14-432V, 2016 WL 3944703, at *3 (Fed. Cl. Spec. Mstr. Roth June 24, 2016) (citing *McCulloch* as support for her awarded rate of fees). I myself also found that Special Master Gowan's analysis of the range of attorneys' hourly rates in *McCullough* was persuasive, in *Manning v. HHS*, No. 14-753V, 2016 WL 4527582 (Fed. Cl. Spec. Mstr. July 29, 2016).

Among the many fees decisions in which special masters acknowledged the persuasiveness of the *McCulloch* analysis, two cases were later reviewed by judges of the U.S. Court of Federal Claims, and affirmed. See *Garrison v. HHS*, No. 14-762V, 128 Fed. Cl. 99 (Fed. C. Aug. 17, 2017); *Raymo*, 129 Fed. Cl. 691.

As stated in *McCulloch*, the following factors are paramount in deciding a reasonable forum hourly rate: experience in the Vaccine Program, overall legal experience, the quality of work performed, and the reputation in the legal community and community at large. 2015 WL 5634323, at *17. Special Master Gowan concluded that "the range of $350 to $425 an hour for attorneys with more than 20 years of experience is a reasonable forum rate." *Id.*, at *19. Applying that standard, the *McCulloch* decision in 2015 awarded hourly rates for two of the most experienced attorneys who practice in the Vaccine Program, of $415/hour and $400/hour, respectively, for work performed in 2014 and 2015.[30] This determination is important because Mr. McHugh has a level of experience that is similar to the two lawyers in *McCulloch*.[31]

Thereafter, the *McCulloch* ranges of hourly rates for Vaccine Act attorneys were suggested by the Office of Special Masters in the "Attorneys' Forum Hourly Rate Fee Schedule: 2015-2016."[32]

### 3. Subsequent decisions concerning Mr. McHugh's hourly rates

In *Mostovoy v. HHS*, Chief Special Master Dorsey reviewed the rates of pay awarded for Mr. McHugh's work in *Rodriguez* and noted that Petitioners' requested hourly rates of pay for Mr. McHugh had been influenced by the *McCulloch* decision. 2016 WL 720969, *4. Based on

---

[30] Petitioner's application acknowledges the persuasive effect of the *McCulloch* analysis and, in particular, argues that the *updated* rate of compensation for attorneys with Mr. McHugh's level of experience would be $394-440/hour in 2017. (ECF No. 362, pp. 14-15.) This range is from the "Attorneys' Forum Hourly Rate Fee Schedule: 2017," available at http://www.cofc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule-2017.pdf.

[31] *McCulloch*, 2015 WL 5634323, at *16, states that "It is also very important to note that none of the attorneys in the 20+ years of experience category listed above, with the exception of Lisa Roquemore and John McHugh, have close to the same experience in the Vaccine Program as do the three senior partners at [Conway, Homer, Chin-Caplan]."

[32] See http://www.uscfc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule-2015-2016.pdf. These rates were further updated for 2017 in a subsequent fee schedule. *See* footnote 30, *supra*.

that review, the Chief Special Master determined that Mr. McHugh was entitled to hourly rates of "$330.00 in 2009, $340.00 in 2011, $345.00 in 2012, $350.00 in 2013, and $400.00 in 2014." (*Id.*)

In *Bokmuller v. HHS*, No. 08-573V, 2016 WL7011357 (Fed. Cl. Spec. Mstr. Nov. 4, 2016), petitioner requested that Mr. McHugh's hourly rates of pay should be compensated at $335/hour in 2010; $340/hour in 2011-12; $355/hour in 2014; and $364/hour in 2015. (*Id.* at *2.) I determined that these were appropriate hourly rates of payment for the legal work performed by Mr. McHugh in the *Bokmuller* case. (*Id.*)

### B.   *Analysis of appropriate hourly rates for Petitioner's counsel in this case*

#### 1.   *Hourly rates of Mr. McHugh*

The current fees application covers legal work performed from May 2013 through March 2017.   Mr. McHugh's billing record seeks an hourly rate of $415 in 2013, $420 in 2014, $425 in 2015, and $430 in 2016 and 2017.  (ECF No. 362-3.)  Ms. Sturm requests $475 per hour for work performed in 2013 and 2014. (ECF No. 363-1.)  However, I do not find these rates to be reasonable.

I note that Petitioner's application in the present case was filed over a year **after** the publication of the *Mostovoy* decision, on February 4, 2016, in which Chief Special Master Dorsey applied the *McCulloch* hourly rate ranges specifically to Mr. McHugh's request for attorneys' fees. (*See* 2016 WL 720969.)   As described above, the *Mostovoy* decision awarded significantly lower hourly rates of pay than the amounts requested here.  Likewise, in *Bokmuller*, I awarded attorneys' fees based on hourly rates that are significantly lower than those requested in the instant case.

I have carefully reviewed Petitioner's application, along with the affidavits and billing records filed in support of that request.  (*See* ECF No. 362.)  There is no evidence in this filing suggesting that Mr. McHugh's level of experience and competence is somehow significantly greater than what has been previously recognized in *Mostovoy*.   I conclude that the appropriate hourly rate for an attorney with Mr. McHugh's legal experience, reputation and quality of work is roughly consistent with the hourly rates awarded in *Mostovoy*. In this case, I award hourly rates of $350 in 2013; $375 in 2014; $400 in 2015; and $415 in 2016 and 2017.  Petitioner's award will be based on these rates.

#### 2.   *Hourly Rates of Mrs. Sturm*

Additionally, I have reviewed Ms. Sturm's affidavit and resume submitted in support of her requested hourly rate. Like Mr. McHugh, Ms. Sturm has been practicing law for over 40 years, having been first admitted to practice in 1977. (ECF No. 362-6.)  Unlike Mr. McHugh, I see no evidence of any significant prior vaccine experience, though her resume states that she worked on "numerous" vaccine cases with Mr. McHugh between 2011 and 2014.  Ms. Sturm has

significant prior judicial experience, much of it in New York State Family Court. (ECF No. 362-7.)

Ms. Sturm's requested hourly rate of $475 is excessive, exceeding the rates identified in the above-discussed *McCulloch* decision for an attorney of her experience.  Indeed, I find no reason why Ms. Sturm should not be awarded the *same* rates as Mr. McHugh for work performed in this case.  Upon my review of the billing records and prior history of this case, Ms. Sturm appears to have performed work comparable to Mr. McHugh's work in this case and has done so as co-counsel and peer.  Nor do I see any evidence that either attorney was any more or less efficient than the other.  Although Ms. Sturm requested a rate higher than Mr. McHugh requested, there is certainly no basis for awarding her a rate higher than Mr. McHugh as Mr. McHugh is the counsel or record, has had a longer overall legal career, and has more vaccine experience.

Thus, in this case, I award Ms. Sturm an hourly rate of $350 for work performed in 2013 and $375 for work performed in 2014.

### 3. Rate for paralegal work

Ms. Sturm requests an hourly rate of $150 per hour for paralegal work performed in this case. (ECF No. 363-1, p. 11.)  In her affidavit, Ms. Sturm indicates that this rate is derived from the paralegal rate charged by Mr. McHugh's office (ECF No. 362-6, p. 4); however, in this case, Mr. McHugh charged only $125 per hour for paralegal work (ECF No. 362-3, pp. 6-7).[33]  Ms. Sturm did not otherwise substantiated her requested paralegal rate.  In keeping with *McCulloch*, I find Mr. McHugh's proposed paralegal rate to be more reasonable for work performed in this case and will award Ms. Sturm $125 per hour for her paralegal work.

## VI
## CONCLUSION

In sum, petitioner's counsel's hours are reduced as follows:

- Mr. Gaynor's hours (2016-17) are reduced by 146.2 hours[34] from 146.2 to **zero hours**;

- Ms. Sturm's 2013 hours are reduced by 124.73 hours[35] from 206.9 to **82.17 hours**;

---

[33] This discrepancy may arise because Mr. McHugh's paralegal billing is dated May 26, 2013, through August 28, 2015, whereas Ms. Sturm's paralegal hours are dated September 11, 2015, through March 5, 2017.  However, since all of Ms. Sturm's paralegal hours are related to invoice preparation and her last billing in the case was otherwise in July of 2014, I do not find it reasonable for Ms. Sturm to charge an inflated rate for later-performed work that should have been done earlier.  Attorneys are obligated to keep *contemporaneous* billing records.

[34] *See* section III(C) above.

[35] This accounts for both a 1.4 hour reduction in section IV(B) related to Dr. Deth's untimely submissions and a 123.33 hour reduction in section IV(C)(6) attributable to the 60% reduction in her hours during the post-hearing phase of the case.

- Ms. Sturm's 2014 hours are reduced by 262.86 hours[36] from 438.1 to **175.24 hours**;
- Ms. Sturm's paralegal hours are reduced by 45 hours[37] from 55 to **10 hours**;

- Mr. McHugh's 2013 hours are reduced by 62.1 hours[38] from 108.7 to **46.6 hours**;
- Mr. McHugh's 2014 hours are reduced by 195.8 hours[39] from 391.6 to **195.8 hours**;
- Mr. McHugh's 2015 hours are reduced by 83.55hours[40] from 167 to **83.45 hours**;
- Mr. McHugh's 2016 hours are reduced by 14.7 hours[41] from 14.9 hours to **0.2 hours**;
- Mr. McHugh's 2017 hours are not reduced and remain at **8.2 hours**;
- Mr. McHugh's paralegal hours are not reduced and remain at **15.3 hours**.

Applying the above-discussed hourly rates to these reduced hour totals results in the following awards of attorneys' fees:

- For Mr. Gaynor: **No award**

- For Ms. Sturm:
  - 2013 - $350/hr (82.17 hrs) =        $28,759.50
  - 2014 - $375/hr (175.24hrs) =        $65,715.00
  - Para. - $125/hr (10hrs) =        $1,250.00
  - **Total:**        **$95,724.50**

- For Mr. McHugh:
  - 2013 - $350/hr (46.6 hrs) =        $16,310.00
  - 2014 - $375/hr (195.8 hrs) =        $73,425.00
  - 2015 - $400/hr (83.45 hrs) =        $33,380.00
  - 2016 - $415/hr (0.2 hrs) =        $83.00
  - 2017 - $415/hr (8.2 hrs) =        $3,394.80
  - Para. - $125 (15.3 hrs) =        $1,912.50
  - **Total:**        **$128,505.30**

---

[36] *See* section IV(C)(6) above.

[37] *See* section IV(D) above.

[38] This accounts for both a 15.5 hour reduction in section IV(B) related to Dr. Deth's untimely submissions and a 46.6 hour reduction in section (IV(C)(6) attributable to the 50% reduction in hours during the post-hearing phase of the case.

[39] *See* section IV(C)(6) above.

[40] This accounts for both a 76.75 hour reduction in section IV(A) attributable to the 50% reduction in Mr. McHugh's hours for the motion for review and a 6.8 hour reduction in section IV(C)(6) attributable to the 50% reduction in hours during the post-hearing phase of the case.

[41] *See* section III(C) above.

In addition, I award attorneys' costs as follows:
- Mr. Gaynor:  Costs reduced from $778.95 to **$0**.
- Mr. McHugh: Costs reduced from $14,990.18 to **$1,472.25**

The Vaccine Act permits an award of reasonable attorneys' fees and costs. § 15(e). Based on all of the above, the undersigned **GRANTS** petitioner's motion for attorneys' fees and costs in the reduced amount of $225,702.10

**Accordingly, the undersigned awards the total of $225,702.10[42] as a lump sum in the form of a check jointly payable to petitioner and petitioner's counsel John F. McHugh, Esq.**

The clerk of the court shall enter judgment in accordance herewith.[43]

**IT IS SO ORDERED.**

/s/ George L. Hastings, Jr.
George L. Hastings, Jr.
Special Master

---

[42] This amount is intended to cover all legal expenses incurred in this matter.  This award encompasses all charges by the attorney against a client, "advanced costs" as well as fees for legal services rendered.  Furthermore, § 15(e)(3) prevents an attorney from charging or collecting fees (including costs) that would be in addition to the amount awarded herein.  *See generally Beck v.HHS,* 924 F.2d 1029 (Fed. Cir.1991).

[43] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.